IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MIDLOTHIAN ENTERPRISES, INC.,
    Plaintiff,

v.                                                     Civil Action No. 3:19-cv-51

OWNERS INSURANCE COMPANY,
    Defendant.

## OPINION

In October, 2018, JoAnne Davis, an employee of Midlothian Enterprises, Inc. ("Midlothian"), received an email from the Midlothian president and shareholder, E. Bryce Powell, asking her to wire thousands of dollars from Midlothian's bank account to a bank account in Alabama. After she wired the funds, Midlothian discovered that hackers, not Powell, had sent Davis the email and had stolen the money. Midlothian submitted a claim to Owners Insurance Company ("Owners"), asking Owners to cover the loss under its insurance policy ("the policy"). Owners denied coverage.

Midlothian sued Owners in the Henrico County Circuit Court, arguing that Owners must cover the loss under two endorsements in the policy. Midlothian also alleged that Owners acted in bad faith in denying coverage. Owners removed the case to this Court. The parties have both moved for summary judgment. Because neither endorsement covers the loss and Owners did not act in bad faith, the Court will grant Owners' motion for summary judgment and will deny Midlothian's motion for summary judgment.

# I. BACKGROUND

## *A. Policy Endorsements*

Midlothian purchased an insurance policy from Owners effective May 1, 2018, through May 1, 2019. The standard policy does not cover "[a]ccounts, bills, currency, food stamps[,] or other evidences of debt, money, notes[,] or securities." (Dk. No. 9-4, at 20.) Midlothian, however, purchased endorsements to supplement the standard policy, two of which are at issue here.

First, the "money and securities endorsement" provides,

> A. COVERAGE is amended as follows:
>
>> 1. Under **2. Property Not Covered, a.** is deleted and replaced by the following for this endorsement only:
>>
>>> b. Accounts, bills, currency, food stamps[,] or other evidences of debt, money, notes[,] or securities. Lottery tickets held for sale are not securities.
>>>
>>> However, "money" and "securities" are covered as provided by this endorsement.
>>
>> 2. Under **4. Additional Coverages,** the following Additional Coverage is added:
>
> **Money And Securities**
>
> **a. Inside The Premises**
>
>> (1) We will pay for loss of "money" and "securities" inside the "premises" or a "banking premises" resulting directly from:
>>
>>> (a) "Theft"; or
>>>
>>> (b) Disappearance or destruction.

(*Id.* at 14.) The money and securities endorsement includes a "voluntary parting exclusion," which provides:

> 2. We will not pay for loss caused by any of the following: . . .
>
> . . .

> **n. Voluntary Parting Of Title To Or Possession Of Property:** Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

(*Id.* at 15.)

Second, the "forgery or alteration endorsement" provides,

**A. COVERAGE**

We will pay for loss involving Covered Instruments resulting directly from Covered Causes of Loss.

**1. Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders[,] or directions to pay a sum certain in "money" that are:

> **a.** Made or drawn by or drawn upon you;
>
> **b.** Made or drawn by one acting as your agent; or
>
> that are purported to have been so made or drawn.

**2. Covered Cause of Loss:** Forgery or alteration of, on[,] or in any Covered Instrument.

(*Id.* at 8.)

### *B. The Fraud*

On October 5, 2018, hackers sent an email to Davis from Powell's email account, directing her to wire money to a specified bank account to purchase a subscription and a membership interest in Fanalter LLC ("the LLC subscription"). As part of her job, Davis would wire money from Midlothian's bank account to other bank accounts when Powell asked her to do so. Thus, believing that Powell had sent the email, Davis wired $42,302.46 to a bank account in Alabama ("the loss").

After Davis wired the money, Midlothian discovered that hackers, not Powell, had sent the fraudulent email to Davis and had stolen the money she wired.[1]

On October 11, 2018, Midlothian submitted a claim for the loss under the policy. On October 18, 2018, Owners denied overage for the loss based on the voluntary parting exclusion in the money and securities endorsement. Midlothian then asked Owners to cover the loss under the forgery or alteration endorsement. Owners, however, declined to do so.

On December 27, 2018, Midlothian filed this case in the Henrico County Circuit Court, seeking a declaratory judgment pursuant to Virginia Code § 8.01.184 that the policy covered the loss, and alleging that Owners acted in bad faith by not expressly considering coverage under the forgery or alteration endorsement in violation of Virginia Code § 38.2-209. Owners removed the case to this Court. The parties have both moved for summary judgment, asking the Court to decide whether the policy covers the loss and whether Owners acted in bad faith.

## II. DISCUSSION[2]

### A. Applicable Law

A court applies normal contract interpretation principals when interpreting an insurance policy and must interpret the policy in accordance with "the plain meaning that reasonable insurers and insureds likely would have attributed to the words" of the policy. *See Erie Ins. Exch. v. EPC*

---

[1] Midlothian alleges that Davis made another wire transfer based on a separate email, but it does not seek coverage for that transfer.

[2] Summary judgment becomes appropriate when the movant establishes that no genuine dispute of any material fact exists and the party is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). If a court finds that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," the court must deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

*MD 15, LLC*, 297 Va. 21, 27-28, 822 S.E.2d 351, 354-55 (2019). Thus, when deciding a motion for summary judgment, a court must first determine whether the policy is ambiguous or unambiguous. *See Harleysville Mut. Ins. Co. v. Dollins*, 201 Va. 73, 77, 109 S.E.2d 405, 409 (1959). If the policy is unambiguous, a court must enforce it as written. *See State Farm Fire & Cas. Co. v. Walton*, 423 S.E.2d 188, 191, 244 Va. 498, 502 (1992); *see also Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729, 237 Va. 148, 152 (1989). If "the language is ambiguous or doubtful . . . , it must be interpreted more strongly against the insurer." *Harleysville Mut. Ins. Co.*, 109 S.E.2d at 409, 201 Va. at 77; *see also Erie Ins. Exch.*, 297 Va. at 29, 822 S.E.2d at 355.

A court "must not strain to find ambiguities." *Admiral Ins. Co. v. G4S Youth Servs.*, 634 F. Supp. 2d 605, 612 (E.D. Va. 2009). "[C]onflicting interpretations [of an insurance policy] reveal an ambiguity only where they are reasonable." *Erie Ins. Exch.*, 297 Va. at 29, 822 S.E.2d at 355. The fact that a word has more than one definition or a party can "hypothesize" about another interpretation does not render a policy provision ambiguous. *Id.* at 29-30, 822 S.E.2d at 355-56. Rather, "[a] reasonable or fairly claimed interpretation is one of two competing interpretations that are equally possible given the text and context of the disputed provision." *Id.* at 29, 822 S.E.2d at 355 (quotations omitted).

Moreover, a court should "not myopically focus on a word here or a phrase there," but should "look[] at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement." *Id.* at 28, 822 S.E.2d at 355. Relatedly, a court must not treat part of a policy as meaningless if it can give that part "any meaning . . . reasonably consistent with other parts of the contract." *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011). Virginia courts "will not read contracts to produce absurd results." *Levine v. Emp'rs Ins. Co. of Wausau*, 887 F.3d 623, 632 (4th Cir. 2018)

(applying Virginia law). "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 200, 796 S.E.2d 549, 555 (2017).

## B. Application

### 1. Money and Securities Endorsement

Owners concedes that the money and securities endorsement applies to loss of money, but it argues that the voluntary parting exclusion precludes Midlothian from recovering the loss based on the plain language of the exclusion.[3] Under the voluntary parting exclusion, Owners does not cover a "[l]oss resulting from [Midlothian's], or anyone acting on [Midlothian's] express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property." (Dk. No. 9-4, at 15.)

The plain language of this exclusion unambiguously includes Midlothian's loss. Davis, acting on behalf of Powell, wired money from Midlothian's bank account to the hackers' bank account. Although Powell did not make the request, that does not change the voluntariness of the transfer itself. *See, e.g., Martin, Shudt, Wallace, Dilorenzo & Johnson v. Travelers Indem. Co. of Conn.*, No. 1:13-CV-0498 LEK/CFH, 2014 WL 460045, at *3 (N.D.N.Y. Feb. 5, 2014) (collecting cases and concluding that the fact "[t]hat [the] [p]laintiff wired the money in reliance on misrepresentations or false pretenses does not alter the voluntariness of that parting"). Davis had the authority to make these types of transfers based on Midlothian's normal business practices, and she freely transferred the money once she believed she had received instructions to do so.

---

[3] When an insurer denies coverage based on a policy exclusion, the insurer bears the burden of showing that the exclusion applies. *Admiral Ins. Co.*, 634 F. Supp. 2d at 612. A court must enforce a "[r]easonable policy exclusion[] not in conflict with statute" as long as the exclusion "clearly and unambiguously bring[s] the particular act or omission within its scope." *Floyd v. N. Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993).

6

Moreover, the exclusion applies to any voluntary parting "induced by *any* dishonest act"—a broad category that certainly includes fraud. (Dk. No. 9-4, at 15 (emphasis added).)

Midlothian, however, argues that the Court cannot reasonably read the exclusion to apply to the loss. First, Midlothian tries to create ambiguities in the voluntary parting exclusion by pointing to terms "with more than one meaning or interpretation that conclude in different results in the interpretation of the exclusion." (Dk. No. 10, at 14.) The fact that a word or phrase has more than one dictionary definition, however, does not make a provision ambiguous. *See Erie Ins. Exch.*, 297 Va. at 29, 822 S.E.2d at 355. Instead, the Court considers the words of the policy provision in the context of the endorsement as a whole. *See id.*

As explained above, the endorsement excludes the loss based on its plain language. Midlothian asks the Court to "strain to find ambiguities" in the exclusion without suggesting any reasonable alternative interpretation. *Admiral Ins. Co.*, 634 F. Supp. 2d at 612; *see Erie Ins. Exch.*, 297 Va. at 29, 822 S.E.2d at 355-56. Indeed, "courts [are not] at liberty to rewrite the contractual language, even if the plain language of the contract produces what some may consider a harsh result." *Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 575 (E.D. Va. 2002) (quotations omitted).

Second, Midlothian, relying on *Elam v. Ford*, 145 Va. 536, 134 S.E. 670 (1926), contends that "a person who is the victim of an act of stea[l]ing, theft, or fraud is not deemed to have consented to or voluntarily parted with title to or possession of property." (Dk. No. 10, at 14.) Midlothian misplaces its reliance on *Elam*. In *Elam*, the Court considered whether the defendant fraudulently induced the plaintiff to enter into a contract for timber wood. Applying legal principles regarding when fraud may void a contract, the Court held that the parties had formed an

7

enforceable agreement. *Elam* does not stand for a broad rule that a victim of fraud can never act voluntarily.

Third, Midlothian contends that Davis did not act with Powell's express or implied authority because Powell did not send the email, and thus, did not authorize the transaction. Midlothian's interpretation fails because it leads to absurd results. The exclusion applies to a voluntary parting "induced by any dishonest act." (Dk. No. 9-4, at 15.) This broad exclusion plainly contemplates a fraudulently authorized transaction, one form of a dishonest act. Allowing coverage of a fraudulently authorized transaction despite an exclusion based on "*any* dishonest act" would unreasonably limit the exclusion and render the provision meaningless. (*Id.* (emphasis added)); *see SunTrust Mortg., Inc.*, 800 F. Supp. 2d at 731.

Thus, there is only one reasonable interpretation of the voluntary parting exclusion as applied to the facts here: that the money and securities endorsement does not cover a loss caused by an employee, such as Davis, voluntarily wiring money to another account due to a fraudulent email. The fact that another individual pretended to authorize the transaction does not negate the voluntariness of the transfer or the authority Davis had to make these types of transfers. Accordingly, the exclusion is not ambiguous, and the Court will enforce its interpretation as a matter of law.

### 2. *Forgery or Alteration Endorsement*

As for the forgery or alteration endorsement, the parties disagree about whether the email directing Davis to wire the funds constitutes a "covered instrument" under the endorsement. The forgery or alteration endorsement defines "covered instruments" as "[c]hecks, drafts, promissory notes, or similar written promises, orders[,] or directions to pay a sum certain in 'money.'" (Dk. No. 9-4, at 8.) Midlothian contends that the fraudulent email constitutes an order or direction to

pay money. Owners argues that the "orders or directions pay" must be similar to a check, draft, or promissory note for the forgery or alteration endorsement to apply, and that the fraudulent email is not similar to those types of items.

When interpreting a list of "specific items 'followed by a word of general import, the general word will not be construed to include things in its widest scope but only those things of the same import as that of the specific item[s] listed.'" *Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*, No. 2:12CV546, 2013 WL 12131747, at *9 (E.D. Va. Aug. 23, 2013) (quoting *Turner v. Reed*, 258 Va. 406, 410, 518 S.E.2d 832, 834 (1999)) (alteration in original). Here, the phrase "or similar written promises, orders[,] or directions to pay a sum certain in 'money'" modifies a specific list of items: checks, drafts, or promissory notes. (Dk. No. 9-4, at 8.) The "promises, orders[,] or directions to pay" must, therefore, resemble a check, draft, or promissory note. (*Id.*) Simply put, an email from a business owner telling an employee to wire money to a bank account does not have the same form or legal effect as a check, draft, or promissory note. Thus, it does not constitute a "covered instrument" under the explicit terms of the endorsement.

Midlothian makes several arguments about why a "covered instrument" can include a non-negotiable instrument, but those arguments miss the point. The Court need only decide whether the fraudulent email directing the wire transfer falls within the definition of a "covered instrument" under the forgery or alteration endorsement.[4] Here, the intention of the parties is clear: a "covered

---

[4] To the extent that Midlothian argues that the LLC subscription agreement attached to the fraudulent email constitutes a "covered instrument," that argument also fails. Midlothian did not file the agreement as part of the record, so that agreement is not before the Court. In any event, an LLC subscription agreement is not similar to a check, draft, or promissory note.

9

instrument" does not include a fraudulent email. Accordingly, the forgery or alteration endorsement does not cover the loss as a matter of law.[5]

## III. CONCLUSION

For the foregoing reasons, the Court will grant Owners' motion for summary judgment and will deny Midlothian's motion for summary judgment.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 20 February 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[5] Because Midlothian is not entitled to coverage as a matter of law, Owners did not act in bad faith. *See Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 693-94 (E.D. Va. 2017), *aff'd*, 757 F. App'x 229 (4th Cir. 2018). Thus, the Court declines to award attorney's fees pursuant to Virginia Code § 38.2-209.

10